**In re Richard M. BECK and Mary Ann Beck, Debtors.**

**Richard M. Beck, on Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**Gold Key Lease, Inc., Defendant.**

**Bankruptcy No. 98–11845DWS. Adversary No. 01–0384.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 15, 2002.

Joseph C. Kohn, Kohn, Swift & Graf, P.C., Philadelphia, PA, Robert F. Mitsch, St. Paul, MN, for Plaintiff.

Stephen G. Harvey, Pepper Hamilton LLP, Philadelphia, PA, Donald J. Querio, San Francisco, CA, for Defendant.

Dave P. Adams, Philadelphia, PA, United States Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Renewed Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Renewed Motion") and Supplemental Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Supplemental Motion") filed by defendant, Gold Key Lease, Inc. ("Gold Key"). The Renewed Motion seeks dismissal on the grounds that there is no private right of action under 11 U.S.C. § 524. The Supplemental Motion asserts that Gold Key's claim against Richard Beck ("Plaintiff") for excess mileage charges under an automobile lease constitutes a post-petition debt or claim, and as such, a violation of the reaffirmation requirement or discharge injunction as asserted in the Complaint could not occur as a matter of law. Upon consideration, Gold Key's Supplemental Motion is denied. Moreover, while I hold that Plaintiff does not have a private right of action under § 524, dismissal of Count II of the Complaint is not warranted because Plaintiff has also alleged that Gold Key should be held in civil contempt for violating the discharge injunction imposed by § 524(a).

## BACKGROUND

On November 14, 1996, Plaintiff entered into an automobile lease (the "Lease"), dated November 14, 1996, covering a 1995 Chrysler Sebring (the "Vehicle"). Complaint ¶ 9. Gold Key is the holder of the Lease. Supplemental Motion, Exhibit A (Lease).[1] The Lease, which was for a two year period ending on November 14, 1998,

---

1. While Plaintiff's claims are based in part on the Lease, he failed to attach a copy of the Lease to the Complaint. However, Gold Key attached a copy of the Lease to its Supplemental Motion. I am entitled to consider the provisions of the Lease without converting the instant motions into motions for summary judgment. *See Pension Benefit Guaranty Corporation v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993) ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

Gold Key, however, asks that I make certain findings related to the notice it had of Debtors' bankruptcy case, thereby converting this motion to one seeking summary judgment. Plaintiff objects on the grounds that the issue presents a factual dispute for trial. *See* Memorandum of Law in Opposition to Defendant Gold Key Lease, Inc.'s Supplemental Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Brief in Opposition to Supplemental Motion") at 2 n. 1. Because Federal Rule 12(b) requires that the opposing party be given reasonable opportunity to present all material pertinent to a motion treated as one for summary judgment and Plaintiff avers that such opportunity would yield controverted facts, I deny Gold Key's request to treat this motion as one for summary judgment. In any event, Gold Key's notice, while relevant to whether it did violate the discharge injunction, is not relevant to whether the debt is dischargeable in a no-asset case. *See infra* note 13.

required Plaintiff to make twenty-four monthly payments of $341.54 and a final payment, at Plaintiff's option, of either (a) $18,300.74 plus applicable taxes or fees to purchase the Vehicle or (b) an amount equal to 15 cents for each mile in excess of 24,000 miles shown on the odometer. *Id.* ¶¶ 4, 9, 10.[2] *Id.* ¶ 10. Paragraph 14 of the Lease deals with defaults. This paragraph provides:

> You will be in default if (a) You do not make any Monthly Payment when due, (b) a bankruptcy is filed by You or Against You, (c) the Vehicle is seized by any governmental authority, (d) You gave any false or misleading information when applying for the Lease, or (e) You do not keep any other agreement in this Lease. If you default, Chrysler Financial may end this Lease, take the Vehicle and sell it. You agree that Chrysler Financial can go on Your property to peacefully take the Vehicle. You will pay the Unpaid Net Capitalized Cost (see item 16) plus any other amounts then due under this Lease minus the net amount received by Chrysler Financial after selling the Vehicle. You will pay all expenses paid by Chrysler Financial to obtain, hold and sell the Vehicle.[3]

Lease ¶ 14. Paragraph 16 of the Lease provides for voluntary early termination of the Lease. This provision states, in pertinent part:

> You may terminate this Lease early. If You do, You must return the Vehicle to the Lessor. You must also pay Chrysler Financial an early termination fee of $250 plus the difference between the Unpaid Net Capitalized Cost and the Fair Market Wholesale Value of the Vehicle, plus any other amounts then due.

*Id.* ¶ 16.

On February 12, 1998, Plaintiff and his wife (collectively referred to as "Debtors") filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. Complaint ¶¶ 5, 8. Prior to that date, Plaintiff made the monthly payments due under the Lease. *Id.* ¶ 9. After that date, Plaintiff retained possession of the Vehicle and continued making the payments due under the Lease. *Id.* ¶ 16.[4]

On June 4, 1998, Debtors received a discharge in their bankruptcy case.[5] Later the same month, their bankruptcy case was closed, and the trustee was discharged

---

2. Paragraph 10 states, in relevant part:
 If You do not buy the Vehicle at the end of the Lease, You will be required to pay 15 cents for each mile in excess of 24,000 miles shown on the odometer.
 *Id.* The parties refer to this monetary obligation as the excess mileage charge, and I will do likewise.

3. Gold Key is the assignee of the Lease. *See* Lease at 1 ("This Lease is accepted and assigned to the Holder [referring to Gold Key] according to the terms of the agreements between Lessor and Holder.").

4. Although Plaintiff did not specifically allege in the Complaint that he continued to make the monthly payments due under the Lease after Debtors commenced their bankruptcy case, it is inferred from the allegations in the Complaint and the parties agreed at the hear-

ing that this fact is undisputed. *There is no contention that the acceptance of these payments violated the discharge injunction.* *Du-Bois v. Ford Motor Credit Corp. (In re DuBois),* 2001 WL 290353, at *2 (D.Minn.2001) (section 524(f) provides that a debtor may voluntarily repay debt).

5. I take judicial notice of the docket in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill. 1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

having fully administered this no-asset case.

On or about December 7, 1998, following the end of the Lease term on November 14, 1998, Plaintiff returned the Vehicle to Gold Key.[6] On the same date or shortly thereafter, Gold Key prepared and sent to Plaintiff a final invoice on the Lease in the amount of "$4,394.09 for excess miles driven on the vehicle."[7] *Id.* ¶ 11. Plaintiff paid a portion of the amount listed on the invoice, "including $350 by application of his security deposit to the debt and also by paying directly the sum of $1,700." *Id.* The balance of $2,344.09 remains due and owing, and Gold Key tried to collect it. *Id.* Gold Key never sought or obtained a reaffirmation agreement.

On January 4, 2001, Plaintiff commenced a class action against Gold Key by filing a complaint (the "Complaint") in the United States District Court for the Eastern District of Pennsylvania. The Complaint contains three counts. Counts I and II allege that Gold Key willfully violated 11 U.S.C. § 524(c) and 11 U.S.C. § 524(a), respectively.[8] Count III alleges that Gold Key violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

Gold Key subsequently filed a motion to dismiss. Rather than ruling on the aforementioned motion, District Judge Robreno issued an Order referring Counts I and II of the Complaint to this court for disposition in Debtors' bankruptcy case.[9] On May 23, 2001, I issued an order reopening Debtors' bankruptcy case pursuant to 11 U.S.C. § 350, ordering the Clerk of Court to issue an adversary number to the above-captioned action and, based on a colloquy with counsel, setting a briefing schedule for Gold Key to renew its motion to dismiss.

On June 5, 2001, Gold Key filed its Renewed Motion asserting that no private cause of action exists under § 524. After Plaintiff filed his response and Gold Key filed a reply, a hearing was held on the Renewed Motion. At the hearing, I asked Gold Key whether it conceded that the claim against the Plaintiff for excess mileage charges constituted a dischargeable debt. As it was unprepared to address that question, a telephone conference was held shortly thereafter at which Gold Key requested the opportunity to supplement its Renewed Motion to assert as an additional ground for dismissal of Counts I and II of the Complaint that its claim for excess mileage under the Lease is a post-

---

**6.** While this fact is also not specifically alleged in the Complaint, *see supra* n. 2, it is inferred from the facts set forth therein. Plaintiff also states this fact on page 2 of his brief in opposition to the Supplemental Motion. *See* Brief in Opposition to Supplemental Motion at 2.

**7.** Even if the Complaint alleged that the Vehicle already had more than 24,000 miles on it prior to the commencement of Debtors' bankruptcy case or that the vast majority of miles on the Vehicle were incurred prior to the commencement of Debtors' bankruptcy, as Plaintiff states on pages 2–3 of his Brief in Opposition to the Motion, the outcome of the Supplemental Motion would be the same.

**8.** In Count I of the Complaint, Plaintiff alleges that by "solicitation and collection of monies

from [him] . . . and by application of such funds to satisfy pre-petition debts of Plaintiff . . . without first securing reaffirmation agreements with the Bankruptcy Court," Gold Key wilfully violated "the reaffirmation requirements of 11 U.S.C. § 524(c)." Complaint ¶¶ 54–55. In Count II, Plaintiff asserts that "[b]y soliciting payment in the above-described manner, and by taking actions to collect, recover and/or offset debt as a personal liability of the discharged Plaintiff . . . ," Gold Key willfully violated the discharge injunction of 11 U.S.C. § 524(a)(2).

**9.** Judge Robreno stayed Count III of the Complaint "pending resolution of bankruptcy proceedings."

petition claim not subject to the discharge injunction of § 524(a) or the reaffirmation requirements of § 524(c). Plaintiff did not object to the request, and I granted it. Briefing of the additional issue followed, and the matter is ripe for determination.

## DISCUSSION

### I.

As stated above, the Supplemental Motion raises the issue of whether Gold Key's claim for excess mileage under the Lease constitutes a non-dischargeable debt. I address this motion first because if the answer to the aforementioned issue is in the affirmative, it would be unnecessary to address the Renewed Motion as the issue it presents would be rendered moot. Section § 524(c), upon which Plaintiff's claim in Count I is based, is only applicable to agreements, "the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title[.]" 11 U.S.C. § 524(c). A discharge in a Chapter 7 case is granted pursuant to § 727. Unless Plaintiff's debt to Gold Key for the excess mileage charge is within the scope of the discharge granted pursuant to § 727, Plaintiff does not have a claim against Gold Key under § 524(c).

Similarly, in Chapter 7 cases, the discharge injunction in § 542(a)(2), upon which Plaintiff's claim in Count II is based, applies only to debts that have been discharged under § 727. *See* 11 U.S.C. § 524(a)(2) ("A discharge in a case under this title [referring to the Bankruptcy Code] ... operates as an injunction against ... an act, to collect, recover or offset any such debt [referring, in relevant part, to any debt discharged under section 727] as a personal liability of the debt-

or[.]"). Consequently, unless Plaintiff's debt to Gold Key for the excess mileage charge was discharged under § 727, the discharge injunction in § 542(a)(2) does not apply to that debt and Plaintiff does not have a claim based on that section. Accordingly, I turn first to the provisions of § 727.

Section 727(b) sets forth the scope of the discharge granted to Chapter 7 debtors under § 727(a). *See* 11 U.S.C. § 727(a) & (b). With respect to Chapter 7 cases, debts or claims that do not fall within the scope of the discharge under § 727(a) are not subject to the discharge injunction in § 524(a) or the reaffirmation requirements of § 524(c). *See* 11 U.S.C. §§ 524(a) & 524(c). Section 727(b) provides, in relevant part:

> [A] discharge under subsection (a) of this section discharges a debtor from all debts that arose before the date of the order for relief under this chapter,[10] and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, ... [.]

11 U.S.C. § 727(b). Significantly, there are two types of debt discharged under § 727(b): (1) debt that arose prepetition and (2) claims determined under § 502. As defined in the Bankruptcy Code, the term "debt" means "liability on a claim." 11 U.S.C. § 101(12). The term "claim," in turn means:

> (A) right to payment, whether or not such right is such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

---

10. Pursuant to 11 U.S.C. § 301, the commencement of a voluntary case under Chapter 7 "constitutes an order for relief under such chapter." Consequently, a discharge under § 727(b) discharges a debtor from all debts that arose before the commencement of his or her voluntary case under Chapter 7.

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

11 U.S.C. § 101(5).

## II.

 Plaintiff presents two arguments in support of his contention that the excess mileage charge constitutes a dischargeable debt. First, Plaintiff argues that rejection of the Lease in the Chapter 7 case constituted a breach of the Lease which pursuant to §§ 365(g)(1) and 502 is deemed to have occurred on the date immediately preceding the filing of the Debtors' bankruptcy petition, thus rendering the excess mileage claim dischargeable under § 727(b). Second, Plaintiff contends that the excess mileage charge is a prepetition claim because Gold Key's right to payment arose prepetition.

Gold Key does not really address the first argument, resting on its conclusory statement that the excess mileage charge did not arise from the rejection of the Lease. *See* Memorandum of Law in Support of Defendant Gold Key Lease, Inc.'s Supplemental Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Brief in Support of Supplemental Motion") at 4 n. 4.[11] Focusing on the second argument, Gold Key asserts that the excess mileage claim is a debt, the right to payment for which arose when the Vehicle was surrendered post-petition and post-discharge and thus fully collectible.

None of the cases cited by the parties addressed the obligation at issue here, *i.e.,* one arising at the end of an otherwise fully performed automobile lease for excess mileage. However, applying the well established principles articulated in these decisions and others my research has uncovered, I find Debtor's personal liability for monetary obligations under the Lease, including the lump sum final payment for excess mileage, to have been discharged as a result of the deemed rejection of the Lease.

## A.

 Section 365(d)(1) of the Bankruptcy Code states in relevant part:

In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential or real property or of personal property of the debtor within 60 days after the order for relief, ...then such contract or lease is deemed rejected.

11 U.S.C. § 365(d)(1). Pursuant to this provision, the Lease was deemed rejected, as Plaintiff asserts, when the Trustee failed to assume or reject it within 60 days of the Order for Relief.[12] Section 502(g) states, in pertinent part: "A claim arising from the rejection, under section 365 of this title ... of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined ... the same as if such claim had arisen before the

---

11. In its initial brief, Gold Key summarily disclaims the relevance of the § 727(b) discharge for § 502(g) relation back claims in this case. In his Brief in Opposition to Supplemental Motion, Plaintiff presses and develops that theory of the case. Nonetheless, in its reply brief, Gold Key again dismisses that argument, noting that it does not assert a claim arising from rejection of the Lease.

Reply Brief in Support of Supplemental Motion at 2. How Gold Key characterizes its claim is not dispositive of the nature of that claim which is the very issue I must decide herein.

12. It is not disputed that the Trustee did not assume the Lease within 60 days after the commencement of Debtors' bankruptcy case.

date of the filing of the petition." 11 U.S.C. § 502(g). Based on this provision, any claim arising from the rejection of the Lease, as Plaintiff indicated, constitutes a pre-petition claim. Lastly, § 365(g)(1) provides, in relevant part: "[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—if such lease has not been assumed under this section[.]" 11 U.S.C. § 365(g)(1). Pursuant to this section, the rejection of the Lease constituted, as Plaintiff contends, a breach of the Lease.

Section 727(b) provides that except for debts found non-dischargeable under the dischargeability exceptions of § 523, the § 727(a) discharge discharges (1) all debts that arose before the order for relief and (2) "any liability on a claim that is determined under § 502 of this section as if such claim had arisen before the commencement of the case." 11 U.S.C. § 727(b). That a lease rejection claim falls into the second category is patently clear from the cases cited by Plaintiff in his brief. *See Chateau Communities, Inc. v. Miller*, 252 B.R. 121 (E.D.Mich.2000); *In re Knight*, 211 B.R. 747 (Bankr.D.Or.1997); *Maupin v. Franklin Equity Leasing Co. (In re Maupin)*, 165 B.R. 864 (Bankr. M.D.Tenn.1994).

In *Maupin v. Franklin Equity Leasing Co. (In re Maupin)*, 165 B.R. 864 (Bankr. M.D.Tenn.1994), the debtor had entered into an automobile lease which obligated her to pay sixty monthly payments. Before the lease term expired, the debtor filed for bankruptcy. Although she revealed her intent at the creditor's meeting to surrender the vehicle to Franklin Equity Leasing Co. ("FELCO") and FELCO obtained relief from the stay with respect to the vehicle, FELCO did not take possession of the vehicle until after the debtor received her discharge order. In the meantime, debtor used and drove the vehicle. FELCO subsequently sued the debtor in state court post-discharge seeking to recover funds for the debtor's use of the vehicle from the petition date until it repossessed the vehicle. In response to FELCO's suit, the debtor commenced an adversary proceeding seeking damages for FELCO's violation of the discharge order.

The issue addressed by the court was whether the debt which FELCO sought to collect was under § 502(g), a claim arising from the rejection of an unexpired lease under § 365. In making its determination, the bankruptcy court recognized that "[t]he Bankruptcy Code does not expressly provide a formula for computing damages for the breach of a lease of personal property as it does with a lease of real property" but nevertheless found that an allowed damages claim in bankruptcy would include the lessor's damages for the debtor's post-petition use of the vehicle and calculated that claim as the unpaid monthly lease payments from the petition date until turnover of the vehicle. *Id.* at 866. FELCO's state law action was therefore found to be a violation of the debtor's discharge.

*Chateau Communities, Inc. v. Miller, supra,* holds likewise with respect to a rejection claim for post-petition rent. In *Miller*, the month to month lease at issue was for a lot on which debtor's mobile home stood. After the filing, the debtor did not live in the home and stated her intention to surrender it. Three days before she received her order of discharge, the mortgagor foreclosed upon the mobile home. After debtor received her discharge, Chateau sought and obtained a judgment in state court for rent and lot charges accruing under its lease from the date upon which the debtor filed her bankruptcy petition until the mortgagor foreclosed upon the mobile home. Thereafter, the bankruptcy case was closed. On a

motion for contempt against Chateau, the bankruptcy court held that Chateau had violated the post-discharge injunction under § 524(a)(2) because debtor's debt to it under the lease constituted a pre-petition debt. On appeal, the district court affirmed the bankruptcy court's decision. Rejecting Chateau's argument that the debt on the lease (the monthly rental and lot charges) arose post-petition, the district court affirmed relying on § 365(d)(1) and 502(g). Like the debtor in *Maupin,* the rejection claim was determined to be the unpaid rent which accrued from bankruptcy to recovery of the property.

Notably in *Miller* the lessor relied on a line of cases which construe post-petition condominium fees as non-dischargeable claims. That authority was found inapposite because the obligations at issue did not involve an unexpired lease or executory contract and accordingly § 365(d) and (g) were not considered. *Miller, supra,* 252 B.R. at 124; *In re Miller,* 247 B.R. 224, 227 (Bankr.E.D.Mich.2000). The basis for the discharge in *Miller* was the second sentence of § 727(b), *i.e.,* liability of a claim determined under § 502. Accordingly, cases applying the first sentence of § 727(b), *i.e.,* right payment arising pre-petition, were not dispositive.

In *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332 (3d Cir.1985), the Third Circuit ruled that in determining whether a claim arose or existed pre-petition, the threshold issue, " 'to be determined by reference to state law[,]' " is whether a "right to payment" existed pre-petition. *Id.* at 336 (*quoting Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct.

237, 91 L.Ed. 162 (1946)). In support of its position, Gold Key relies on several cases which applied the *Frenville* holding in contexts involving obligations arising post-petition (including condominium fees) but not involving unexpired leases and executory contracts. Brief in Support of Supplemental Motion at 9. Significantly, the relation back provision of § 365(g) and § 502 did not control the outcome of these decisions. Applying these provisions with the second sentence of § 727(b) requires that certain post petition claims be treated as arising prepetition for purposes of distribution and discharge. Without regard to the *Frenville* analysis, the claims, albeit based on rights to payment arising post-petition, are treated as prepetition. Thus, contrary to Gold Key's contention, the dispositive question here is not when the right to payment arose under state law. Even accepting its view of the post-petition character of its claim, the dispositive issue here is whether the claim arose as a result of the rejection of the Lease, thereby requiring it to be treated as a prepetition claim under § 502(g) and discharged under a separate provision of § 727(b). If that issue is resolved in Plaintiff's favor, the condominium cases and the *Frenville* analysis are irrelevant here as well.

### B.

Finding myself to be in accord with *Maupin* and *Miller,* I must then determine whether the claim at issue here, *i.e.,* for excess mileage charged at the conclusion of an otherwise fully performed lease, is a claim arising from rejection of the Lease. If so, unless any § 523 non-dischargeability exception is applicable,[13] the debt has been discharged. I am unaware

---

13. Gold Key contends it had no notice of the bankruptcy case. Section 523(a)(3) creates an exception to the discharge of known debts that are neither listed no scheduled under § 521 unless the creditor had knowledge of

the case in time to file a timely proof of claim. While Gold Key is listed on the Schedule G, Executory Contracts and Unexpired Leases, it is not listed as a creditor on any Schedule nor included in the mailing matrix. Fed.R.Evid.

of any Code provision, and Plaintiff has not cited any, that specifically dictates the damages to which a lessor is entitled when a lease of personal property is rejected. As noted by the Second Circuit Court of Appeals in *Medical Malpractice Insurance Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386 (2d Cir.1997),

> The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor.[14] However, the Code does not determine the parties' rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law.

3 Collier on Bankruptcy (Lawrence P. King et al., eds., 15th ed.2001) ¶ 365.09[1], at 365–73 ("Rejection does not ... affect the parties' substantive rights under the contract or lease, such as the amount owing or a measure of damages for breach."). *See also In re Dabrowski*, 257 B.R. 394, 414 n. 40 (Bankr.S.D.N.Y.2001) (emphasis in original) (noting "the need to distinguish between the *fact* of the breach resulting from deemed rejection under section 365(d)(1) and the *consequences* of that breach and that state law determines the latter.").

 I previously noted in *In re Weinstock*, 1998 WL 401521, at * 3 (Bankr.

E.D.Pa. July 16, 1998), and *In re Bacon*, 212 B.R. 66, 69 (Bankr.E.D.Pa.1997), that the rejection of an executory contract or unexpired lease under § 365 does not mean that the contract or lease is terminated. *See also In re Lavigne*, 114 F.3d at 386 *(quoting In re Yasin*, 179 B.R. 43, 50 (Bankr.S.D.N.Y.1995)) ("Under section 365, rejection constitutes a statutory breach, but does not repudiate or terminate the lease."). Rather, rejection simply means that the estate has elected not to become obligated under such contract or lease. *In re Weinstock, supra* (*citing* Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding "Rejection," 59 U. Colo. L.R. 845, 848 (1988)[15]). *See also Lavigne, supra.* Moreover, "[t]o state that there is a 'breach' is to say, in effect, simply that for claims allowance purposes in bankruptcy, it will be presumed (conclusively) that a debtor will not perform its pending obligations." Andrew, *supra*, 59 U. Colo. L.Rev. at 873. However, since the lease contract is not terminated by rejection, the parties are not foreclosed from performance post-bankruptcy and the extant contract will define the terms of the performance although clearly it will not obligate the debtor to perform absent reaffirmation.[16] 11 U.S.C. § 524(f);

---

201 (allowing court to take judicial notice of the bankruptcy schedules). However, the question of its actual notice is in dispute. Yet, this bankruptcy was administered as a no-asset case. In *Judd v. Wolfe*, 78 F.3d 110 (3d Cir.1996), the Third Circuit held that in a no-asset case where proofs of claim are not required to be filed, other than debt sought to be excepted under § 523(a)(2),(4),(6), debt is discharged whether or not it is listed. Accordingly for the purpose of discharge of its debt, Gold Key's notice is irrelevant.

**14.** As this is a no asset Chapter 7 case, the benefit which relation back is intended to confer on the non-debtor is irrelevant here.

**15.** Explaining the concept of rejection, this author stated:

> Rejection is not the revocation or repudiation or cancellation of a contract or lease, nor does it affect contract or lease liabilities. It is simply a bankruptcy estate's decision not to assume, because the contract or lease does not represent a favorable or appropriate investment of the estate's resources.
> *Id.*

**16.** It is undisputed that no reaffirmation occurred here nor is there any contention that a new post-petition lease was entered.

*DuBois v. Ford Motor Credit Company,* 2001 WL 290353 (D.Minn.2001).

In *Maupin* and *Miller,* the lease obligations were monthly installment payments which the debtors had not paid post-petition. In *Maupin,* the debtor at the § 341 meeting indicated her intention to surrender the vehicle but FELCO, which had secured relief from stay, did not take possession until after the discharge allowing the debtor to drive it without payment. In *Miller,* the debtor indicated on her statement of intentions that she would surrender the mobile home and made no further payments. The lessors were free to repossess the property but had not done so. In this case, the Plaintiff made all monthly installments under the Lease. It was only after the Lease term had concluded and he had surrendered the Vehicle that he failed to make the final payment. Gold Key contends that under this scenario it had no effective remedy for non-payment. According to Gold Key, "[i]f Gold Key had notice of the bankruptcy petition, under the Code or under the terms of the lease it could have sought to terminate the lease and take steps to protect its collateral (*i.e.,* repossess it before Plaintiff drove it any further), but that is hypothetical. Gold Key never got notice of the bankruptcy petition and kept driving the car until the expiration of the lease." Reply Brief in Support of the Supplemental Motion at 2.

Whether Gold Key had notice of the bankruptcy or whether it had an effective remedy is not dispositive of whether the excess mileage claim was discharged in this no-asset case. In *DuBois v. Ford Motor Credit Company, supra,* the debtors filed under Chapter 7 in March, made an April lease payment on their vehicle and stated by letter to the lessor as well as on their Schedule G, Executory Contracts and Unexpired Leases, their intention to continue making payments on the lease. After their discharge in June, they made another payment under the lease, and then entered into a new vehicle lease paying a lump sum to satisfy the obligation under the initial lease. They subsequently filed suit [17] contending that the lessor violated (1) the discharge injunction of § 524(a)(2) by accepting the payments and sending payment reminders and (2) the reaffirmation requirements of § 524(c) by sending a letter inquiring of their intentions with regard to the vehicle. The Court rejected these arguments, agreeing with the lessor that the payments were voluntary and not induced by the creditor. In so holding, the Court noted that had the debtors failed to make these payments after discharge, § 524(a) would have prohibited the lessor from pursuing an in personam action against the debtors for amounts due under the lease. Notably the payment obligation at issue was a final lump sum obligation under the lease which was found to have been discharged.

*In re Knight, supra,* while involving a vehicle lease, did not require a determination of the dischargeability of obligations. Rather, the matter before the court was a motion by the lessor seeking to compel the trustee to assume or reject the vehicle lease under 11 U.S.C. § 365(a).[18] In deny-

---

**17.** Like here, the suit was commenced as a class action and alleged violations of § 524 and the Fair Debt Collection Practices Act. The factual difference is that in *DuBois,* the debtors paid the final lump sum obligation when it was charged and the Plaintiff here refused.

**18.** The Court noted that the motion represented one of many similar motions being routinely filed by GMAC in Chapter 7 cases where debtors were current on their leases to force the debtors to assume obligations under the leases. Since a trustee, and not the debtor, has the power to assume a lease, the motion was in effect a demand that the trustee as-

ing the motion, the bankruptcy court concluded that assumption conferred no benefit on the estate which could be burdened with an administrative claim if the debtor did not perform in the future. In the course of its decision, the court examined the options available to a lessee and lessor of a vehicle lease when the lessee files a Chapter 7 bankruptcy case. The bankruptcy court stated in pertinent part:

When a vehicle lessee files a Chapter 7 bankruptcy petition, in the normal course the lessee/debtor shortly thereafter will obtain a personal discharge from her lease payment obligation. Section 524(a) then enjoins the lessor from any act to collect the lease payments from the debtor. If the debtor does not wish to keep the vehicle, she may surrender it to the lessor. If, at the time of bankruptcy filing, the debtor is not current on her lease payments, the lessor may file a motion for relief from stay and

probably will obtain relief to exercise its right under the contract to repossess the vehicle. However, if, at the time of filing, the debtor is current on her lease payments and decides to continue the payments and drive the vehicle the lessor has fewer options. It may be unsuccessful with any motion for relief from stay for the purpose of taking possession of the vehicle because the debtor is not in default under the terms of the lease.[19] *If at any time in the future during the lease term the debtor decided to stop making the lease payments the lessor would be prohibited from collecting the balance of the lease payments from the debtor.* Meanwhile, the debtor has had the use of a depreciating vehicle. If, postbankruptcy, the debtor missed a lease payment but wished to cure the default and continue the lease payments, because of the discharge of her personal liability for the payments, the lessor cannot tell the debtor that if she wants

---

sume and assign to the debtor the unexpired lease, thereby obligating the debtor to the post-petition payments.

**19.** Notably this motion and the similar motions referred to by the Court were filed before the 60 day assumption/rejection period expired. Thus, the Court's comments about the lessor's options did not expressly address whether the lessor was compelled to accept payment post-rejection when the debtor no longer had an obligation to pay. Gold Key assumes that if it had notice of the bankruptcy, it would have had the option to terminate the Lease post-rejection notwithstanding the absence of any monetary default. While that issue is not before me, Gold Key's assumption seems correct. Since the breach caused by rejection excuses the lessee from performance of his personal obligations under a lease, such breach is material and should likewise give the lessor a right to recover its property to mitigate a potential future dischargeable debt. *See Cimina v. Bronich,* 517 Pa. 378, 383, 537 A.2d 1355, 1358 (1988) (noting well-established principle of contract law which applies to leases that a material failure of performance by one party discharges the other party to the contract); *Ott v. Buehler Lumber*

*Company,* 373 Pa.Super. 515, 518, 541 A.2d 1143, 1145 (1988) (acknowledging general rule of contract law that "a party who materially breached a contract may not complain if the other party refuses to perform his obligations under the contract."). *See also In re CVA General Contractors, Inc.,* 267 B.R. 773, 778 (Bankr.W.D.Tex.2001) (rejection under § 365 relieved insurer of "any *further* obligation to furnish coverage for any *future* period from and after the date of the filing of the bankruptcy case, and to afford [the insurer] (if it so chose) the right to file a proof of claim for any unpaid premium obligations due as of bankruptcy filing."). However, as noted above, where the lessor has not exercised that right either with knowledge (*e.g., Maupin, Miller*) or ignorance, the dischargeable debt does not ride through bankruptcy in a no-asset case. While this may have a harsher outcome to the lessor who has no notice of the bankruptcy, it is no more painful than the consequences to a lessor whose lessee files bankruptcy at the end of the lease term, surrendering the vehicle and refusing to pay the excess mileage charges.

to cure the default and keep the vehicle she has an obligation to make timely future payments. If the trustee were to assume the vehicle lease and assign it to a debtor who was current on her lease payments and wished to keep the vehicle, GMAC's dilemma would be solved. It could enforce all its rights under the terms of the original lease, including its right to recover the balance of the lease payments from the debtor.

211 B.R. at 747 (footnotes omitted).

■ In the face of these decisions, albeit distinguishable from the facts presented here, I find no principled basis to conclude the excess mileage charges are not damages upon rejection of the Lease. The fact that the payment was not due until the end of the Lease provides no basis for excepting it from the debt to be discharged. *See DuBois, supra.* The fact that the Plaintiff made all previous payments provides no basis for excepting it from the debt to be discharged. *See Knight supra.* Rejection of the Lease constituted a breach which generates a claim deemed to occur prepetition without regard to when the obligation otherwise came due. The analytical construct framed by Professor Andrews underscores the fallacy of Gold Key's position. "To state that there is a 'breach' is

to say, in effect, simply that for claims allowance purposes in bankruptcy, it will be presumed (conclusively) that a debtor will not perform its pending obligations." Andrew, *supra,* 59 U. Colo. L.R. at 848. To the extent the debtor performs some or all of those obligations, the resultant claim will obviously be reduced or eliminated. Performance does not bear on the existence of the claim but the amount.

In this case, the Plaintiff performed all but the final payment obligation. He failed to pay the agreed excess mileage charges when he returned the Vehicle. That non-bankruptcy breach is a default under paragraph 14 of the Lease. ("You will be in default if . . . (e) You do not keep any other agreement in this Lease.").[20] Paragraph 14 of the Lease also sets forth the consequences of a default thereunder. That paragraph provides, in relevant part,

If you default, Chrysler Financial may end this Lease, take the Vehicle and sell it. You agree that Chrysler Financial can go on Your property to peacefully take the Vehicle. You will pay the Unpaid Net Capitalized Cost (see item 16) plus any other amounts then due under this Lease minus the net amount received by Chrysler Financial after sell-

---

**20.** While an argument can be made that the breach occasioned by Lease rejection constituted a default, Plaintiff is incorrect in arguing that he defaulted under the Lease when he filed his bankruptcy case. This argument ignores the impact of § 365(e) which provides, in pertinent part:

Notwithstanding a provision in an executory contract or unexpired lease, . . . an executory contract or unexpired lease of the debtor may not be terminated or modified . . . at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

 * * * * * *

(B) the commencement of a case under this title[.]

11 U.S.C. § 365(e)(1)(B). Pursuant to this provision, "ipso facto" or "bankruptcy" clauses in leases are rendered inoperative in bankruptcy cases. *E.g. Kopelman v. Halvajian (In re Triangle Laboratories, Inc.),* 663 F.2d 463, 466 (3d Cir.1981) (ruling that § 365(e) renders bankruptcy termination clauses "unenforceable"); *Winthrop Resources Corporation v. Forman Enterprises, Inc. (In re Forman Enterprises, Inc.),* 2000 WL 1849672, at *2 n. 4 (Bankr.W.D.Pa. Dec.14, 2000) (noting that § 365(e)(1) invalidates ipso facto clauses such as one contained in the equipment lease at issue which defined an event under the lease to include the filing of bankruptcy).

ing the Vehicle. You will pay all expenses paid by Chrysler Financial to obtain, hold and sell the Vehicle.

Lease ¶ 14. Plaintiff's contractual default occurred after he returned the Vehicle at the end of the Lease. Rather then calculate its damages as outlined in paragraph 14, Gold Key sought to collect the lump sum payment for the excess mileage.[21] That obligation was clearly due under the Lease and is part of Gold Key's rejection damages which by reason of the relation back provision of § 365(g) and 502 has been discharged.

### III.

■ Since Gold Key's claim for excess mileage charges constitutes a discharged claim, the provisions of § 524 are applicable thereto. Consequently, I must turn to the Renewed Motion which seeks to dismiss Plaintiff's claims in Count I (violation of the reaffirmation requirements) and Count II (violation of the discharge injunction) insofar as the claims assert a private right of action under § 524. While Plaintiff also seeks relief for these same actions pursuant to the statutory contempt powers provided by § 105 or this court's inherent power to sanction violations of court orders (i.e., the discharge injunction), that remedy may not provide the foundation for the class status which the Complaint seeks. *See Williams v. Sears, Roebuck*

*and Co. (In re Williams)*, 244 B.R. 858, 867 (S.D.Ga.2000) (concluding that relief for violations of § 524 may be sought only in the court that entered the injunction); *see also Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 916 (7th Cir.2001) (noting plaintiff's argument that class action relief will be precluded for violations of the requirement in § 524(c) that reaffirmation agreements must be filed if contempt is the sole remedy for such violations). *But see Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 445–46 (1st Cir.) (rejecting theory that contempt proceeding pursuant to § 105 for violating the statutory injunction in § 524 must be confined to the court which issued the original discharge order), *cert. denied*, 532 U.S. 1048, 121 S.Ct. 2016, 149 L.Ed.2d 1018 (2001). Thus, although not a basis to dismiss this Complaint, whether there is a private right of action under § 524 may limit the potential reach of this lawsuit.

As both parties note, in *Lesniewski v. Kamin (In re Lesniewski)*, 246 B.R. 202, 214–15 (Bankr.E.D.Pa.2000), I joined with those courts which have held that there is no private right of action under § 524. Plaintiff contends that I should re-visit this issue because my ruling regarding the existence of a private right of action under § 524 "was not central to the decision in *Lesniewski*."

---

**21.** Item 16 referred to in paragraph 14 contains a right to terminate the Lease early upon payment of a fee of "$250 plus the difference between the Unpaid Net Capitalized Cost and the Fair Market Wholesale Value of the Vehicle, plus any other amounts then due." Unpaid Net Capitalized Cost reduces each month by payments and is calculated on default and early termination in essentially the same manner. The payment obligation on default, however, subtracts the net amount the lessor receives upon sale of the repossessed vehicle whereas upon early termination the lessee gets credit for the Fair Market Wholesale Value which at the option of the lessee may be an agreed upon amount, the amount determined by a professional appraisal or the net amount received by the lessor upon sale. Significantly the measure of damages in each case is driven by the condition of the vehicle when recovered since that factor would in large part determine its depreciated value. Gold Key does not contend that the payment obligation under the Lease upon return of the Vehicle through a default or early termination would be non-dischargeable. There is no logical reason the payment obligation at the conclusion of the lease term would be otherwise.

I addressed the following two major issues in *Lesniewski:* (1) whether the defendants who were state officials could shield themselves from liability by invoking the Eleventh Amendment, 246 B.R. at 205–210; and (2) whether the plaintiff could assert a claim under 42 U.S.C. § 1983 for violations of § 524 and § 525 of the Bankruptcy Code, 246 B.R. at 210–218. In the course of ruling in the negative on the latter issue, I observed that while the plaintiff was "advancing the broad proposition that a violation of the Bankruptcy Code, a federal statute, by a state actor under color of state law, supports a cause of action under § 1983," she had not cited "any authority or even [made] the argument that a violation of the § 524 discharge injunction [ ] give[s] rise to a § 1983 cause of action." *Id.* at 214. Responding to this omission, I stated:

> This is not surprising as § 524 is generally viewed as implying no private right of action. *See, e.g., Cox v. Zale Delaware, Inc.,* 242 B.R. 444, 447–48 (N.D.Ill. 1999); *Bessette v. AVCO Financial Services, Inc.,* 240 B.R. 147, 154 (D.R.I. 1999); *Costa v. Welch (In re Costa),* 172 B.R. 954, 964 (Bankr.E.D.Cal.1994). Rather the remedy for a violation of the § 524 discharge injunction is contempt. *Id. See also Hardy v. United States,* 97 F.3d 1384, 1388 (11th Cir.1996); *Miller v. Mayer (In re Miller),* 81 B.R. 669, 672 (Bankr.M.D.Fla.1988); *Behrens v. Woodhaven Association (In re Behrens),* 87 B.R. 971, 975 (Bankr.N.D.Ill.1988). Bankruptcy courts have properly awarded attorney's fees against a party that violates the permanent injunction upon a finding of contempt. *Thomas v. Resolution Trust Corp. (In re Thomas),* 184

B.R. 237, 241 (Bankr.M.D.N.C.1995) (citing cases). Accordingly, a § 1983 claim cannot lie for a violation of § 524. Thus, the sole basis for a potential award of attorney's fees to Plaintiff is the successful statement of a § 1983 claim based on violation of rights conferred under § 525.

246 B.R. at 214–15. As the aforementioned passage reveals, my ruling that the plaintiff could not assert a claim under 42 U.S.C. § 1983 for a violation of § 524 was based directly on my conclusion that the remedy for a violation of the § 524 is contempt and that no private right action exists for violations of that code provision. Importantly, the aforementioned conclusion also served as a basis for my determination that 42 U.S.C. § 1983 cannot be used to address violations of 11 U.S.C. § 525. *Id.* at 217–18. Consequently, although my discussion of the issue was not lengthy, my ruling in *Lesniewski* that no private cause of action exists under § 524 was "central" to that decision.

When I decided *Lesniewski,* no court of appeals had yet addressed the issue of whether an implied right of action exists under § 524. Since then, two courts of appeals have done so; both have ruled that it does not. *See Cox v. Zale Delaware, Inc., supra* (concluding that a debtor may not sue to rescind a contract by which a creditor attempted to collect a debt that had been discharged since contempt is the exclusive remedy for violations of 524(c)); *Pertuso v. Ford Motor Credit Company,* 233 F.3d 417 (6th Cir.2000) (holding that § 524 does not impliedly create a private right of action).[22] Plaintiff contends that

---

22. In *Bessette v. Avco Financial Services, Inc., supra,* the First Circuit declined to determine whether a private right of action for damages or sanctions exists under § 524 based on its conclusion that § 524 is enforceable through the statutory contempt powers available to courts under § 105. Notably, in reaching its decision, the First Circuit ruled that § 105 "does not itself create a private right of action." 230 F.3d at 444–45. To the extent

these appellate decisions are inapplicable to the instant matter because the plaintiffs therein made voluntary payments to the creditors at issue pursuant to consensual albeit unfiled reaffirmation agreements whereas he was coerced into making payments toward the excess mileage fee by Gold Key's illegal collection activities.[23] A review of the courts of appeals' decisions reveals that, in reaching its holding, the Seventh Circuit focused heavily on the fact that the plaintiff therein voluntarily made the payments which he was seeking to recover from the creditor pursuant to the terms of an unfiled consensual reaffirmation agreement. Yet in addition to so doing, the Court addressed the "hypothetical" situation where, as pled here, the creditor seeks to enforce a discharged debt that has not been voluntarily paid by the debtor and concludes that the best remedy for the injured debtor is a contempt action in bankruptcy court although the debtor can interpose § 524(c) as a defense to a creditor suit to collect a discharged debt. *See Cox v. Zale, supra,* 239 F.3d at 916.[24]

Plaintiff contends otherwise, I agree with the First Circuit and reject Plaintiff's contention.

**23.** Instead of *Cox* and/or *Pertuso,* Plaintiff would have me follow *Molloy v. Primus Automotive Financial Services,* 247 B.R. 804 (C.D.Cal.2000), which is factually similar to the allegations in the instant case in that the plaintiff therein did not sign a reaffirmation agreement and made payments to the creditor as a result of its collection efforts. In *Molloy,* the district court held that held that § 524 "carries with it an implied right of action" and that "a plaintiff may pursue a claim under § 524 for restitution even where there is no reaffirmation agreement to rescind." In so holding, the district court reasoned that Congress intended "to create private cause of action under § 524(c)(2) because that subsection 'provides for rescission' of the reaffirmation agreement." *Id.* at 818 (*quoting Malone v. Norwest Financial California, Inc.,* 245 B.R. 389, 397 (E.D.Cal.2000)). As support for this rationale, the *Molloy* court relied upon *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), which ruled that an implied cause of action existed under Section 215b of the Investment Advisors Act based on language in that provision providing that "contracts whose formation violates the Act 'shall be void.'" *Id.* at 16, 100 S.Ct. 242 (*quoting* 15 U.S.C. § 80b–15). The Supreme Court explained:

[W]hen Congress declared in § 215 that certain contracts were void, it intended the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against the continued operation of the contract, and for restitution.

*Id.* at 19 100 S.Ct. 242. The rationale used by the *Molloy* court and its reliance on *Transamerica* were rejected in *Kibler v. WFS Financial, Inc.,* 2000 WL 1470655 (C.D.Cal. September 13, 2000), wherein the district court declining to follow a prior district decision, cogently stated:

The Court rejects Plaintiffs' argument for two reasons. First, unlike Section 215 of the Investment Advisors Act, section 524(c)(2)(A) of the Bankruptcy Code does not declare non-conforming reaffirmation agreements "void." The provision simply requires creditors to inform debtors of their right to rescind the contract within a specified time period. Second, section 524(c) provides *the exact method* by which debtors may exercise their right to rescind—"by giving notice of the rescission to the holder of the claim." 11 U.S.C. § 524(c)(2)(A). The very language of the section belies all claim that Congress intended to create an all-encompassing private right of action for debtors entering improper reaffirmation agreements. *Transamerica* itself states that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." 444 U.S. at 19, 100 S.Ct. 242.

*Id.* at *7 (emphasis in original).

**24.** The Seventh Circuit notes that had Zale actually committed a deliberate, flagrant breach of the filing requirement, the debtor's remedy would have been to ask the Court to hold Zale in contempt of the discharge order.

The remedy authorized by section 524(a)(2) has the advantage of placing responsibility for enforcing the discharge order in the court that issued it. That makes more

*Pertuso*, the Sixth Circuit's § 524 decision, also involved an unfiled reaffirmation agreement. However, that decision is based on the statutory language and legislative history of § 524 and not the particular conduct that prompted the suit. Consequently, the rationale used by the Sixth Circuit is equally applicable here.

The plaintiffs in *Pertuso* financed the purchase of a van through the defendant. When the plaintiffs filed a bankruptcy case under Chapter 7, they still owed defendant over $18,000. The parties entered into a reaffirmation agreement for this debt but it was never filed with the court. After plaintiffs received their bankruptcy discharge and made payments to defendant pursuant to the terms of the reaffirmation agreement, they instituted a class action suit against the defendant alleging that it "routinely solicited reaffirmation agreements from bankrupt debtors; that it failed to file the agreements in court; and that although the agreements were unenforceable, [the defendant] used them to collect substantial sums from members of the purported class." 233 F.3d at 420. In their complaint, plaintiffs asserted claims against the defendant for, *inter alia*, violations of § 524(a)(2) and 524(c). *Id.*

In holding that § 524 does not impliedly create a private right of action for an asserted violation of that section, the Sixth Circuit turned to the four factors which the Supreme Court identified in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining whether a private right of action exists for breach of a federal statute. These factors are: "(1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted; (2) whether there is any explicit or implicit indication of congressional intent to create or deny a private remedy; (3) whether a private remedy would be consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law." 233 F.3d at 421 (*citing Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. 2080). Based on the Supreme Court's teachings, the Sixth Circuit noted that " '[t]he most important inquiry ... is whether Congress intended to create the private remedy sought by the plaintiffs' " and observed that "the recognition of a private right of action requires affirmative evidence of congressional intent in the language and purpose of the statute or its legislative history." 233 F.3d at 421 (*quoting Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)).

Applying the aforementioned principles of law, the Sixth Circuit first examined the language of § 524(a)(2) and § 524(c) to determine whether it evidences congressional intent to create a private cause of action. It found no such evidence in § 524(a)(2) concluding that "[t]he obvious purpose [of the provision] is to enjoin the proscribed conduct" and that "the traditional remedy for violation of an injunction lies in contempt proceedings, not in a lawsuit such as this one." *Id.* at 421. Insofar as § 524(c), the Sixth Circuit declared:

> sense than a suit seeking more limited relief (a suit for rescission would not entitle the successful plaintiff to attorneys' fees or punitive damages), [citations omitted], which could be filed in any federal district in which Cox could serve Zale. The court that issued the discharge order is in a better position to adjudicate the alleged violation, assess its gravity, and on the basis of that assessment formulate a proper remedy. In the context of debt-reaffirmation agreements the rescission remedy is, for the reasons we've explained, hokey.
>
> *Id.* Thus, while the facts of Cox are distinguishable, the Seventh Circuit's view of the available remedy (*i.e.,* contempt) for coercive actions is not.

[This section] does not proscribe any conduct at all; it merely sets forth the conditions under which a reaffirmation agreement is enforceable. The consequence of not meeting its conditions is that the agreement is unenforceable. Accordingly, in our view, the language of § 524(c) .... does not suggest a legislative intent to provide a private right of action of the sort asserted by the [plaintiffs].

*Id.*

Turning to the legislative history, the Sixth Circuit observed that, in 1984, when Congress amended § 362 to provide an express right of action, it amended § 524 at the same time but chose not to add a private right of action to remedy violations of that section. *Id.* at 422. The Sixth Circuit found this "contrast ... instructive." *Id.* Commenting further on this point, the Sixth Circuit remarked that when the 1984 amendments were made, "Congress knew that courts were enforcing § 524 through contempt proceedings, and ... knew how to create a private cause of action when it wished to do so, but in this instance it elected to do nothing." *Id.* Importantly, the Sixth Circuit also noted that Congress was "currently considering bankruptcy reform, including a proposed amendment that would provide a private right of action under § 524." *Id.* (*citing* H.R. 833, § 114, 106th Cong., 2d Sess. (2000)). Based on these observations and conclusions, the Sixth Circuit concluded that "[u]nder the law as it now states, ... we have no hesitancy in joining those courts (a clear majority) that have held § 524 does not impliedly create a private right of action." *Id.* at 422–23.

The Sixth Circuit's holding is applicable to the instant matter. The conclusion that no private right of action exists under § 524 applies regardless of how § 524 was violated—whether payments made on a

discharged debt were made voluntarily or in response to illegal collection activities. In either case, the remedy for the violation of § 524 is contempt.

Interestingly, subsequent to *Pertuso,* the district court in *DuBois v. Ford Motor Credit Company, supra,* provided the following update on the bankruptcy reform bill which the Sixth Circuit mentioned would have provided a private right of action under § 524:

Since the *Pertuso* opinion was filed, Congress acted on the bankruptcy reform bill. The legislative history of that bill, the Bankruptcy Reform Act of 2000, shows that Congress did not intend § 524 to imply a private right of action.

The precursor to the Bankruptcy Reform Act of 2000 was introduced in the House of Representatives by Representative Gekas (R–Pennsylvania) in 1999. As introduced, H.R. 833 contained an explicit private right of action: "An individual who is injured by the willful failure of a creditor to comply with the requirements for a reaffirmation agreement ... or by any willful violation of the injunction under subsection (a)(2), shall be entitled to recover—(A) the greater of—(i) the amount of actual damages; or (ii) $1,000; and (B) costs and attorneys' fees." H.R. 833 § 114(j)(1), 106th Cong., 1st Sess. (1999). The bill contained this private right of action when it was sent to the Senate for consideration. However, as reported by the Senate Judiciary Committee, the successor to H.R. 833, S. 625, did not contain a private right of action for violations of § 524. As enacted, the Bankruptcy Reform Act of 2000 contained no mention of the private right of action from H.R. 833. This statute was vetoed by President Clinton on December 19, 2000, for reasons unrelated to the issue of a private right of action.

2001 WL 290353, at \*4–\*5 (footnote omitted). Commenting on these findings, the district court stated:

> The fact that the Senate version of the bill removed the private right of action from the House bill is instructive. Clearly, the Senate did not wish to create such a right, and the House acquiesced to the Senate on this issue. Moreover, the fact that the House found it necessary to include a private right of action in § 524 indicates that it believed that no private right of action under this section existed previously.

*Id.* at \*5. I agree with these conclusions. The fact that no private right of action under § 524 was ultimately included in the Bankruptcy Reform Act of 2000 further substantiates the Sixth Circuit's holding that no implied right of action exists under § 524.

### IV.

█ In conclusion, I find that the excess mileage claims have been discharged in Plaintiff's Chapter 7 bankruptcy case but that Plaintiff may not bring a private right of action based on § 524 for himself and on behalf of all others similarly situated seeking damages for Gold Key's post-discharge collection activities. Because the Complaint also alleges that Gold Key should be held in contempt,[25] I will order Gold Key to file an answer after which further pretrial proceedings will be scheduled.

An Order consistent with this Opinion shall issue.

### ORDER

**AND NOW,** this 15th day of January 2002, upon consideration of the Renewed Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Renewed Motion") and Supplemental Motion to Dismiss Counts I and II of Plaintiff's Complaint ("Supplemental Motion") filed by defendant, Gold Key Lease, Inc., and the responses to the Motions filed by plaintiff, Richard M. Beck ("Plaintiff"), and after a

---

**25.** Without citing any case law in support, Gold Key asserts in its brief that if no private right of action is implied by § 524, then Counts I and II must be dismissed because Plaintiff chose not to file a motion for contempt under Fed.R.Bankr.P. 9020. I disagree. When Plaintiff commenced his adversary proceeding on January 4, 2001, Rule 9020 provided, in pertinent part:

> Contempt committed in a case or proceeding pending before a bankruptcy judge ... may be determined by the bankruptcy judge only after hearing with notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose.

Fed.R.Bankr.P. 9020 (prior to amendment of April 23, 2001 which became effective December 1, 2001). As framed, the rule did not state that contempt had to be filed by motion and could not be asserted in an adversary proceeding. Gold Key has not explained why it objects to Plaintiff's contempt action being asserted in this adversary action instead of by motion. Indeed, as the bankruptcy court noted in *Wagner v. Piper Industries (In re Wagner)*, 87 B.R. 612, 619 (Bankr.C.D.Cal.1988), when it rejected the same argument that contempt must be brought as a motion and not as an adversary proceeding, "[a]n adversary proceeding provides the parties with more, not less, procedural protections than what are available in a contested matter by way of motion." Significantly, even if Plaintiff had asserted its contempt action by way of motion, Fed.R.Bankr.P. 9014 allows a bankruptcy court to "direct that one or more of the ... rules in Part VII [referring to the rules applicable to adversary proceedings] shall apply." Consequently, even when filed as a motion, a contempt action can be handled in the same procedural manner as an adversary proceeding should a court so choose.

hearing with notice, and for the reasons set forth in the accompanying Opinion;

It is hereby **ORDERED** that:

1. The Supplemental Motion is **DENIED.**

2. The Renewed Motion is **GRANTED IN PART and DENIED IN PART.** The Renewed Motion is granted to the extent Counts I and II asserted a private right of action under · § 524. However, since Plaintiff has pled an alternative ground for recovery, *i.e.,* contempt, Count II shall not be dismissed.

3. Defendant shall file an answer to the Complaint within 10 days after notice of this Order pursuant to Fed.R.Bankr.P. 7012(a).